UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
RICHARD BRODIE,        :
               :
       Plaintiff,     :   Index No.
               :
   -against-        :
               :
ALEXANDER S.C. ROWER,    :   **JURY TRIAL DEMANDED**
THE CALDER FOUNDATION, and   :
DOES 1-5,         :
               :
       Defendants.   :
-------------------------------------------------------X

    Plaintiff Richard Brodie ("Brodie" or "Plaintiff"), by and through his undersigned counsel

Pryor Cashman LLP, as and for his Complaint against defendants Alexander S.C. (Sandy) Rower

("Rower"), the Calder Foundation (the "Foundation"), and DOES 1-5, respectfully alleges as

follows:

## NATURE OF ACTION

    1.   This case concerns a fraudulent scheme by Rower and the Foundation to destroy

the market value of a multi-million dollar work of art owned by Plaintiff – a glass and wire mobile

(the "Mobile") – by the renowned artist Alexander Calder ("Calder").

    2.   To reinforce confidence in artistic attribution, the art market often looks to the

opinions of recognized authorities with respect to matters concerning authenticity.  This is due to

the presence of fake and forged art in the marketplace, particularly with regard to famous artists.

    3.   If a recognized authority offers a favorable opinion that bears on the issue of an

artwork's authenticity, then its full market value can be realized; but an unfavorable opinion can

destroy the work's market value.

4.    The Foundation is the recognized authority on artworks by Calder.  That is based upon the Foundation's familial connection to Calder (upon information and belief, Rower is Calder's grandson) and its extensive repository of archival documents, much of which are from Calder's records and files.

5.    The Foundation encourages owners of works attributed to Calder to submit such works for evaluation and possible registration in the Foundation's archive.

6.    The Foundation assigns "Application Numbers" (colloquially referred to in the market as "A-numbers") to artworks that the Foundation agrees should be registered in its archive as authentic "Calders."

7.    Upon information and belief, Rower, who is the Foundation's president, is the ultimate decisionmaker within the Foundation as to whether to assign an A-number to a submitted work of art.

8.    When an owner of an artwork that is attributed to Calder submits the work to the Foundation for possible registration, there is a premise that the Foundation will conduct its evaluation honestly and in good faith based upon its expertise and body of archival information.

9.    Rower and the Foundation, however, also bear an inherent conflict of interest because, upon information and belief, they are themselves active buyers and sellers of Calder art.

10.    The Foundation publicly reports art assets of more than $665 million, with millions of dollars in income resulting from its sales of Calder art.

11.    In order to benefit their own position in the market, Rower and the Foundation have the power to subvert their self-appointed marketplace function to manipulate the market of Calder art through sham A-number determinations that are based upon Rower's arbitrary and fraudulent pronouncements, irrespective of the Foundation's actual evidence.

12.     This case arises out of Rower's and the Foundation's arbitrary and fraudulent rescission of an A-number they had previously assigned to the Mobile.

13.     Rower and the Foundation were able to create circumstances enabling their fraudulent rescission of the Mobile's A-number through a highly unusual, if not unique, role they have fashioned for themselves, whereby owners of Calder works with A-numbers already assigned (such as Plaintiff's Mobile) effectively must return to the Foundation for A-number "renewals" when the owners decide to sell their art.

14.     Upon information and belief, dealers and auction houses will refuse to sell Calder artworks that lack A-number "renewals" from the Foundation.

15.     Upon information and belief, dealers and auction houses (and, by extension, Calder artwork owners) would see no reason to obtain A-number "renewals," and would not seek such "renewals," in the absence of pressure from Rower.

16.     Upon information and belief, the pressure that Rower brings to bear on dealers and auction houses to seek A-number "renewals" from the Foundation is an atypical marketplace involvement by an artist foundation.

17.     Through this A-number "renewal" practice, Rower – who has a conflict of interest by virtue of his own and/or the Foundation's activity as sellers and buyers of Calder artworks – is able to police and control the movements of virtually all Calder artworks in the market.

18.     If Rower decides not to renew a work's A-number, or to rescind a work's A-number, then that work's market value will be crippled or destroyed.  Upon information and belief, Rower and the Foundation know this to be true, and they intend such a result.

19.     Rower and the Foundation rescinded the Mobile's A-number in July 2024 on fabricated grounds:  *i.e.*, Rower and the Foundation falsely asserted that the Mobile had suffered

"substantial damages" that "cannot be reversed" and are "impossib[le] to restore," rendering it "no longer in a state that reflects the intentions of Alexander Calder."

20.    As described in detail below, Rower's and the Foundation's statements about the Mobile's physical condition are knowingly false and wholly without basis.

21.    Indeed, immediately prior to Rower's interference, the Foundation's go-to conservator for glass artworks, Abigail Mack ("Mack") – who is also a member of the Foundation's Advisory Board – had performed only minor conservation work on the Mobile in anticipation of its sale and had, upon information and belief, issued a condition report identifying *no* major problems or irreparable damage with the Mobile.

22.    Rower, however, upon information and belief, directed that Mack's report not be shared with Plaintiff or with any prospective purchasers of the Mobile.

23.    Instead, upon information and belief, Rower directed Mack to prepare a new report only days later, at the Foundation's instance and expense, and he directed Mack to state that the Mobile had suffered irreparable damage at some unknown point.

24.    Mack subsequently told Plaintiff's art advisor that the disparaging statements about the Mobile's condition in her second report were, in fact, merely "assumptions" made and dictated by Rower, which, moreover, Mack said Rower could not substantiate with photographic evidence.

25.    Rower fabricated 'facts' (which were, in truth, disguising his own arbitrary statements) about the Mobile's condition, and rescinded the Mobile's A-number, with the intention of destroying its market value.

26.    Prior to Rower's and the Foundation's interference, the Mobile's market value had been at least $8.1 million, which was the price a buyer had agreed to pay – that is, until Rower and the Foundation inserted themselves and their intentionally and materially false second condition

report (provided through Mack) into the planned transaction, which caused the buyer to back out of the deal.

27.    As alleged below, Rower's disruption of sales of authentic Calder artworks, as and when Rower feels like it and regardless of evidence, is part of a racketeering scheme by him to use the Foundation's stature in the marketplace to control and manipulate the market for Calder artworks through acts of fraud.

28.    Upon information and belief, others have been victimized by Rower's and the Foundation's arbitrary and fraudulent efforts to destroy the marketability of Calder artworks.  *See Cramer v. The Calder Found.*, No. 14 CV 1375, 20147 WL 790727 (S.D.N.Y. Feb. 28, 2014).

29.    Rower, the Foundation and DOES 1-5 have caused at least $8.1 million in damages to Plaintiff as a result of their fraudulent and otherwise wrongful conduct.  Plaintiff's claims are brought pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961, *et seq.* ("RICO"), with additional claims for fraud in the *factum*, gross negligence and product disparagement.

## PARTIES

30.    Plaintiff Richard Brodie is an individual who resides in Detroit, Michigan and who is a citizen of Michigan.  Brodie is the current President of the Collections Committee at the Detroit Institute of Arts.  He is also a respected art collector and museum philanthropist, who has owned over twenty important works of art by Calder, many of which have been generously loaned to important exhibitions and published in scholarly catalogues throughout the past 30 years.

31.    Upon information and belief, defendant Rower is an individual who is a citizen of New York and who resides in New York, New York.

32.    Upon information and belief, defendant Foundation is an IRS Section 501(c)(3) not-for-profit corporation organized under the laws of New York with its principal place of

business in New York.  The Foundation's sole stated charitable activity is "cataloguing all the works produced by the artist Alexander Calder and making his works available for public inspection in order to facilitate art education and research."

33.    The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants sued herein as DOES 1 through 5 are presently unknown.  Plaintiff will seek leave to amend this Complaint to allege the true names and capacities of DOES 1 through 5 when the same have been ascertained.  Upon information and belief, each of the fictitiously-named defendants participated with the other defendants in the violations alleged in this Complaint, and performed acts and made statements in furtherance of those violations.

## JURISDICTION AND VENUE

34.    Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331, 1332(a) and 1367.

35.    Venue is proper pursuant to 28 U.S.C. § 1391(b).

## FACTS

### The Foundation's Role In Calder Artwork Evaluations

36.    Upon information and belief, the Foundation was founded by Rower and the Calder family in or about 1987.

37.    Upon information and belief, Rower has been the President of the Foundation since its founding.

38.    Upon information and belief, the Foundation was formed for the initial purpose of preparing a catalogue raisonné of Calder's artworks.  A catalogue raisonné is an authoritative compendium of an artist's known, authentic artworks, often by medium and/or period.

39.    Because of the Foundation's connection to Calder, its own collection of Calder's art (which the Foundation describes on its website as "unsurpassed in both depth and scope" and

"from all periods of Calder's life"), and its archive of information about Calder's life and works (which the Foundation describes as "exhaustive" and "covering all aspects of Calder's life and career"), a catalogue raisonné published by the Foundation would have been viewed by the marketplace as authoritative of an artwork's authenticity: *i.e.*, inclusion of a work of art attributed to Calder in such a catalogue raisonné would have been viewed by the marketplace as determinative of the artwork's authenticity; whereas non-inclusion of a work would have raised questions and doubts in the market as to that work's authenticity.

40.    Nevertheless, the Foundation never published a catalogue raisonné of Calder's art that could be generally available to the public.

41.    Instead, beginning in or about the mid-1990s, Rower elected to have the Foundation register authentic Calder works in its archive by assigning A-numbers to such works on a submission basis.

42.    The Foundation requires those who submit their works for A-number determinations to sign a document called an "Examination Agreement."

43.    The Foundation's Examination Agreement states that it "does not in any way create a contract between the Foundation and [the work's] Owner, for the purpose of authentication or other related matters."

44.    The Examination Agreement also purports, however, to include an agreement by the work's owner not to sue the Foundation in connection with its A-number determinations. That purported agreement is ineffective here.

45.    Upon information and belief, Rower has at all relevant times been the ultimate decisionmaker within the Foundation as to whether the Foundation will assign, or rescind, an A-number to a submitted work.

**The Mobile's Description, Ownership History And Authenticity**

46.    The Mobile consists of a number of intentionally-broken, colored glass pieces (it was a well-known practice of Calder to break glass and incorporate pieces into his mobiles), with wire figures, and connecting and hanging wire.

47.    The Mobile is identified in Daniel Marchesseau's ("Marchesseau") leading 1989 catalog, *The Intimate World of Alexander Calder*.  The appearance of the Mobile as depicted therein, circa 1989, is substantially the same as the Mobile's appearance today.

48.    Brodie purchased the Mobile in 1994 from Calder's close friend and exclusive American gallerist between 1955-1976, Klaus Perls ("Perls"), who had owned the Mobile.

49.    The Mobile was part of the Perls' private collection, and, upon information and belief, previously belonged to Pierre Matisse (the artist Henri Matisse's son), who, upon information and belief, acquired it directly from Calder's studio.

50.    The Foundation registered the Mobile as an authentic Calder artwork in its archive and assigned the Mobile an A-number at some time before Brodie purchased it (the specific time and circumstances of the Foundation's A-number assignment will be learned in discovery).

51.    Rower, who has long known of Brodie given Brodie's prominence as a Calder collector, once told Brodie in or about 1996 that the Mobile – appearing substantially the same as it appears today – is Rower's "favorite" Calder mobile in Brodie's collection.

52.    Thus, it has long been recognized (including by Rower and the Foundation) that the Mobile, as it substantially appears today, is an authentic Calder artwork.

**Rower's Interference With Brodie's Effort To Sell The Mobile In 2018**

53.    In or about November 2018, Brodie decided he wanted to sell the Mobile through a prominent gallery ("Gallery A") in New York City.

54.    The Mobile was consigned to Gallery A for $8 million net to Brodie (and was insured for $9 million for the period of the consignment agreement).

55.    Gallery A sent the Mobile to the Foundation in late-November 2018 with a request that the Foundation renew the Mobile's A-number.

56.    Rower had apparently resolved not to allow Brodie to sell the Mobile because he returned the Mobile to Gallery A on December 21, 2018, without an A-number renewal, and with a statement to the gallery that Rower would speak directly to Brodie about the Mobile after the holidays.

57.    Appallingly, the Mobile was returned to Gallery A without its original hanging wire hardware, and with a fresh break to one of its glass shards.

58.    The Foundation gave no notice to Gallery A or Brodie about the fact that it was returning the Mobile in a different physical state than that in which it had been received.

59.    Brodie (in Michigan) and Rower (in New York) spoke by phone about the Mobile's damage in January 2019.

60.    During that call, Rower falsely professed not to know about any changes to the Mobile's condition while it had been under the Foundation's recent care, and instead tried to deflect the issue by criticizing past, minor conservation work to a small crack in part of the glass (the same glass shard that was returned by the Foundation broken), which Brodie had performed through a reputable, museum-quality conservator in Detroit (where Brodie lives), without the Foundation's involvement.

61.    Upon information and belief from the Foundation's public filings, the Foundation receives over $100,000 annually from conservation-related services.

62.    At no time during the January 2019 call did Rower claim, or suggest, that the Mobile had suffered any substantial damage (at any time) that was supposedly incapable of being restored.

63.    Nor did Rower state or suggest that the Foundation might rescind the Mobile's A-number.

**Rower's Interference With Brodie's Effort To Sell The Mobile In 2019**

64.    After having the damage to the Mobile caused by the Foundation repaired, Brodie again tried to sell it in November 2019, this time through a major auction house (the "Auction House").

65.    The Auction House's representatives told Brodie he needed to have the Foundation renew the Mobile's A-number to enable the sale.

66.    On November 5, 2019, Brodie (in Michigan) signed and sent back to the Foundation (in New York) an Examination Agreement requesting that the Mobile's A-number be renewed.

67.    In connection with Brodie's planned sale of the Mobile, and in view of the Foundation's well-known preference that Mack perform conservation work on Calder's art that includes glass (with associated fees, upon information and belief, paid to the Foundation), Mack was engaged to examine the Mobile, to perform any conservation work, and to issue a condition report.

68.    Upon information and belief from the Auction House, Mack performed her conservation work at her studio in New York in late-November 2019, and she submitted a condition report for the Mobile to the Auction House at the end of November 2019 that identified no remarkable problems with the Mobile's condition (the "November 2019 Report").

69.    The Auction House, however, upon information and belief, was directed by Rower *not* to share the November 2019 Report with Brodie or with any potential buyers of the Mobile.

70.    Brodie has been deprived by Rower of access to the November 2019 Report.

71.    Instead, upon information and belief, Rower directed Mack to issue a new condition report for the Mobile, at the Foundation's own instance and expense.

72.    Upon information and belief from Mack, Rower dictated over the phone to Mack the condition narrative that he wanted her new report to contain, without going to see the Mobile at Mack's studio for himself.

73.    Only days after issuing her November 2019 Report, Mack issued a new condition report to the Auction House on December 3, 2019 (the "December 2019 Report"), criticizing nearly every facet of the Mobile.

74.    Upon information and belief from Mack (who later spoke with Brodie's art advisor), the critical comments about the Mobile's condition in Mack's December 2019 Report were dictated by Rower as "more assumption than fact" by him.

75.    The December 2019 Report states, *inter alia*:

   a.    "The [M]obile has been damaged, possibly significantly, …."

   b.    "The substantial damages are thought to have happened before the image in [Marchesseau's] 1989 catalog, …."

   c.    "Many of the elements are missing sections of glass judging by sharp break edges – it was the artist's working practice to run a tool along the edges of glass fragments to dull them."

d. "[I]t is suspected that the glass elements were once larger [and that] the mobile would have had a different appearance and different weights requiring the strings to be attached to both the bars and the elements in other locations."

76.     The December 2019 Report made no mention of Mack's relatively minor conservation work on the Mobile performed only one week earlier, or of her November 2019 Report prepared only days earlier – which, upon information and belief from the Auction House, had not described the purported problems with the Mobile described in the December 2019 Report.

77.     Upon information and belief, the December 2019 Report, signed by Mack, materially conflicts with the November 2019 Report prepared by Mack, which Rower has prevented Brodie from seeing.

78.     Despite the contents of the December 2019 Report, the Foundation did not rescind the Mobile's A-number.

79.     Nevertheless, upon information and belief, Rower directed the Auction House to share the December 2019 Report with multiple interested buyers of the Mobile.

80.     Upon information and belief, the December 2019 Report successfully repelled a buyer in Japan who had agreed in principle to purchase the Mobile for $8.1 million, and who had further himself paid to ship the Mobile to Japan for viewing, but who backed out after receiving the December 2019 Report.

81.     Upon information and belief, the December 2019 Report also successfully repelled a third-party guarantor from Monaco who had agreed to guarantee a minimum sales price at auction for the Mobile, but who withdrew after receiving the December 2019 Report and, upon further information and belief, after speaking with Rower by phone.

82. Brodie's art advisor attempted to learn more from the Auction House about what Rower had said about the Mobile, but was told that she needed to speak with Rower directly.

83. Brodie's art advisor contacted the Foundation and Mack in March 2020 with a list of questions concerning the December 2019 Report.

84. Mack responded on April 17, 2020, and told Brodie's advisor that she needed to discuss Rower's assumptions expressed in the December 2019 Report with the Foundation, and that Mack was unable to do so herself (even though the December 2019 Report purportedly is by Mack).

85. Mack also told Brodie's advisor that the Foundation does not have any photos of the Mobile that pre-date its appearance in Marchessau's 1989 catalog and that would support Rower's "assumptions" about the Mobile's pre-1989 appearance.

86. Brodie's advisor made several attempts to speak with Rower between March and May 2020 to understand the basis for Rower's position regarding the Mobile's condition prior to 1989, but Rower did not respond.

87. An employee of the Foundation (in New York) eventually responded to Brodie's advisor (in England) that, due to the impact of the COVID-19 pandemic, the Foundation had shut down and its archives could not be reviewed to answer any questions about the December 2019 Report's statements.

88. That response was disingenuous and intended merely as cover where, upon information and belief from Mack, the Foundation's archives could not possibly support Rower's arbitrary assumptions about the Mobile's condition.

**Rower's Interference With Brodie's Effort To Sell The Mobile In 2024**

89.    In or about late-2023/early-2024, Brodie decided once again to try to sell the Mobile, this time through a prominent gallery (the "Gallery B") in New York City.

90.    In connection with that planned sale, a highly respected artwork conservation firm, Amann+Estabrook Conservation Associates ("A+E"), was engaged to examine the Mobile.

91.    A+E issued a condition report for the Mobile on January 20, 2024, stating:

> The work is stable and in *very good condition*.  The red shard and ribbed blue shard have broken and been repaired.  There is no indication that this is a change of condition.  *The shards were likely broken and repaired before being incorporated into the mobile* [*i.e.*, as was Calder's known practice].  The overall balance is good.  The elements freely turn without hitting each other or getting tangled.  [Emphases supplied.]

92.    In February 2024, equipped with A+E's condition report, Brodie had Gallery B return the Mobile to him and he consigned the Mobile once again to the Auction House.

93.    At the Auction House's request, Brodie signed another Examination Agreement with the Foundation on March 21, 2024 (with the same terms as described above) for A-number renewal.

94.    By letter dated July 10, 2024 and sent via e-mail, Rower (from New York) informed Brodie (in Michigan) that the Foundation was standing behind the sham December 2019 Report that Rower had engineered and, moreover, on the basis of that report had decided to rescind the Mobile's A-number, thereby destroying its market value.

95.    Rower claimed in his July 10, 2024 letter that the Foundation's A-number rescission was also based on "research into our archive," which, upon information and belief as described above, was false and misleading.

96.    Rower also falsely stated in his July 10, 2024 letter that the so-called "substantial damages" to the Mobile that supposedly occurred before 1989, as claimed in the December 2019

Report, "cannot be reversed" or restored, rendering the Mobile "no longer in a state that reflects the intentions of Alexander Calder."

97.    These statements by Rower were all contrived and false.

98.    The Mobile's appearance today is substantially the same as its appearance in Marchessau's authoritative 1989 catalog, and as it appeared when Perls sold it to Brodie in 1994.

99.    The Mobile's appearance today is also substantially the same as when Rower previously stated to Brodie in or about 1996 that it was Rower's "favorite" Calder mobile among those that Brodie owns.

100.    The Mobile's appearance today is also substantially the same as when Rower discussed its condition with Brodie in January 2019, without Rower suggesting that it had been irreparably damaged.

101.    The Mobile's appearance today is also substantially the same as when Mack examined it and performed minor conservation work to it in November 2019, and issued her November 2019 Report (which remains concealed from Brodie) without finding any "substantial damages."

102.    The Mobile's appearance today is also substantially the same as when the Foundation assigned it an A-number.

103.    It is thus entirely unsupported and baseless for Rower to assert that the Mobile's appearance does not reflect "the intentions of Alexander Calder."

104.    In addition, the statements in the December 2019 Report that the Mobile is "missing sections of glass judging by sharp break edges" that purportedly are at odds with Calder's "working practice to run a tool along the edges of glass fragments to dull them," are false.

105.   Again, the appearance of the Mobile today is substantially the same as its appearance in 1989 – no sections of glass are "missing," and Rower has not offered any archive information indicating otherwise.

106.   Calder is well known to have personally shattered and then used glass in his mobiles in their naturally broken condition.

107.   The "sharp break edges" in the Mobile's glass are open and obvious, and plainly would have been noticed by Mack when she performed her conservation work and issued her report for the Mobile in November 2019.

108.   Likewise, Rower would have noticed such edges when he complimented the Mobile as his "favorite" in or about 1996, and when he spoke with Brodie about the Mobile in January 2019.

109.   As acknowledged by Mack, the absence of pre-1989 archived images of the Mobile render groundless Rower's "assumption" that the Mobile's glass edges are different from how they appeared when Calder created the work.

110.   Moreover, glass pieces in the Mobile have the same kinds of sharp edges as those in another glass and wire Calder mobile that Brodie once owned, known as *Untitled* (circa 1940s).

111.   Unlike the Mobile, *Untitled* had actually suffered substantial damage in or about 2015, when a contractor working in Brodie's home had accidentally bumped into *Untitled*, causing it to fall and break certain of its glass components.

112.   Brodie asked the Foundation and Rower at the time whether *Untitled* could be restored.

113.   Rower not only agreed that *Untitled* could be restored, he personally sourced the replacement glass.

114.    Mack restored *Untitled* and the Foundation renewed its A-number.

115.    *Untitled*, in its restored condition, bears the same kinds of sharp glass edges as the glass in the Mobile.[1]

116.    In September 2024, Brodie demanded that the Foundation reverse its fraudulent rescission of the Mobile's A-number.

117.    On October 10, 2024, the Foundation responded to Brodie's demand by refusing to reverse its A-number rescission.

118.    In its October 10, 2024 communication, the Foundation claimed that it had done nothing more than express an "opinion" about the Mobile.

119.    Rower's dictated statements about the Mobile's condition in the December 2019 Report, and those in his July 10, 2024 letter, are fraudulently false statements of fact, not mere opinion.

120.    In its October 10, 2024 communication, the Foundation acknowledged that its rescission of the Mobile's A-number had destroyed the Mobile's market value and Brodie's ability to "reap financial profit" by selling the Mobile.

**Rower's Similar Misconduct Directed At Other Owners Of Calder Artworks**

121.    Upon information and belief, Brodie is not the only victim of Rower's fraudulent scheme to destroy the market values of Calder artworks.

122.    In the *Cramer* case cited above, the owner of a Calder mobile alleged how Rower similarly disparaged that work upon false grounds.

---

[1] Rower's malign attitude towards the Mobile relative to *Untitled* is further explained by the fact that the Mobile was once owned by Klaus Perls, where *Untitled* was not. Rower has a demonstrated hostility against Perls, having tried to smear Perls's legacy in a frivolous and bad faith lawsuit filed after Perls died. *See Davidson v. Perls*, 42 Misc. 3d 1205(A), at *8-9 (Sup. Ct. N.Y. Cnty. Dec. 23, 2013) (describing lawsuit directed by Rower on behalf of Calder Estate against Perls as being based upon allegations "so patently inadequate that the court can only conclude that they were brought solely for the purposes of harassment or embarrassment [of Perls].").

123.    Similar to what happened to Brodie with the Mobile, upon information and belief, Rower falsely disparaged the mobile at issue in *Cramer*, known as *Eight Black Leaves*, as a "fragment of a larger work," even though Rower had no evidentiary support for his purported assertion of fact.

124.    Similar to what happened to Brodie with the Mobile, upon information and belief, Rower initially acknowledged the authenticity of *Eight Black Leaves*, but he then refused to issue an A-number for that mobile based upon his fabricated assertion that it is a "fragment of a larger work."

125.    Upon information and belief, as alleged in *Cramer*, the "Foundation's refusal to issue an inventory number for *Eight Black Leaves* [was] motivated by the Foundation's effort to promote the substantial assets managed and held by the Foundation, and its directors, officers and trustees, …. Issuance of the requested inventory number would impact the values of the Calder Foundation's directors' and officers' private collections, as well as the value of those Calder works owned by the Foundation itself." *Cramer*, 2014 WL 790727, at ¶¶ 46-47. A similar bad faith motivation is at issue in this case.

126.    Upon information and belief, discovery will reveal other owners of authentic Calder artworks who have suffered similar harm at the hands of Rower because of the same pattern of fraud.

**FIRST CLAIM FOR RELIEF**
**(Civil RICO against Rower and DOES 1-5)**

127.    Brodie repeats and realleges paragraphs 1 through 126 above as if fully set forth herein.

128.    Rower and DOES 1-5 are each "persons" as defined by 18 U.S.C. § 1961(3).

129.    Rower and DOES 1-5 exploited and used the Foundation as their enterprise, engaging in or affecting interstate or foreign commerce, to carry out the fraudulent manipulation of the market for Calder art through the A-number practices described above.

130.    In so doing, Rower and DOES 1-5 created anticompetitive opportunities to sell their own Calder art.

131.    Rower and DOES 1-5 are each essential to, and directed the operation and management of, their enterprise.

132.    Rower dominates and controls the Foundation to cause it to become the vehicle for his fraudulent A-number determinations.

133.    Plaintiff will ascertain the specific identities and roles of DOES 1-5 through discovery.

134.    In furtherance of their scheme, Rower and DOES 1-5 committed the predicate act of extortion in violation of New York Penal Law § 155.05(2)(e).  Rower and DOES 1-5 repeatedly compelled Brodie against his will, in November 2019 and again in March 2024, to sign the Foundation's Examination Agreement, and to deliver the Mobile to the Foundation for purposes of A-number "renewal," under threat that Rower and DOES 1-5 would otherwise cause sellers of Calder artworks not to deal with Brodie to sell the Mobile, which was calculated both to benefit Rower's own market opportunities and to harm Brodie's market opportunities and financial condition as well as reputation and personal relationships.

135.    In furtherance of the scheme, Rower and DOES 1-5 also committed the predicate act of wire fraud in violation of 18 U.S.C. § 1343.  Rower and DOES 1-5 used wire communications in interstate and foreign commerce to defraud and substantially advance their scheme of fraudulently manipulating the market of Calder artworks through the employment of

the material misrepresentation that the Mobile suffered "substantial damages" prior to 1989 that are "impossib[le]" to restore, thereby irreparably disparaging the Mobile and destroying is market value.

136.    On January 9, 2019, Rower used interstate telephone wire communications to misrepresent to Brodie that the Foundation had not itself altered and damaged the Mobile.

137.    In December 2019, Rower used and caused others to use interstate and foreign wire communications and telephone wire communications to disseminate the bogus December 2019 Report, including to Brodie and to interested buyers of the Mobile.

138.    In May 2020, Rower caused the Foundation to use foreign wire communications to misrepresent to Brodie's art advisor that Rower was unable to respond to Brodie's questions about the December 2019 Report due to the pandemic-induced closure of the Foundation's office.

139.    On July 10, 2024, Rower used interstate wire communications to misrepresent to Brodie that the Mobile had suffered irreparable damage warranting the Foundation's rescission of the Mobile's A-number.

140.    The activities of each of DOES 1-5 in connection with the above-described predicate acts, and other acts, will be learned in discovery.  Brodie will amend his Complaint to conform to such discovered proof.

141.    Rower and DOES 1-5 each knew, expected or reasonably foresaw that the above-described wire activities and acts of extortion would be essential to their scheme and would further the scheme.

142.    The wire activities and acts of extortion described above each and separately constitute "racketeering activity" as defined by 18 U.S.C. § 1961(1).

143.    Upon information and belief, Rower and DOES 1-5 have committed similar racketeering activities and predicate acts of extortion and wire fraud against other victims with the same intent to unlawfully control and manipulate the market of Calder artworks.

144.    Rower and DOES 1-5 engaged in a continuous pattern of racketeering activity as defined by 18 U.S.C. § 1961(5), in that Rower and DOES 1-5 engaged in at least two acts of racketeering activity within a period of ten years of one another.

145.    Rower and DOES 1-5 engaged in an open-ended pattern of racketeering activity in that they used the Foundation for the purpose of extorting and fraudulently depriving owners of Calder artworks of the market value of their property, and in that the predicate acts were a regular way of conducting the Foundation's business such that there was, during the period the acts were conducted, a continued threat of such activity, and that a continued threat is still posed to other owners of Calder artworks who wish to sell them.

146.    The racketeering activities by Rower and DOES 1-5 are related to one another in methodologies, are in furtherance of a common goal of anticompetitive market manipulation, and target similar victims (*i.e.*, owners of Calder art who are having the market values of their works destroyed).

147.    Brodie suffered an injury when Rower and DOES 1-5 rescinded the Mobile's A-number in July 2024 upon fraudulent grounds, thereby taking away Brodie's ability to sell the Mobile and vastly harming its value.

148.    But for the pattern of racketeering activities described above, Brodie would not have suffered injury.

149.    The pattern of racketeering activities proximately caused Brodie's injury in that Brodie's injury was reasonably foreseeable; indeed, Rower and the Foundation expressly

acknowledged to Brodie on July 10, 2024 that Rower's activities had destroyed Brodie's effort to "reap financial profit" by selling the Mobile.

150.    Brodie suffered a loss to his business or property by reason of the racketeering activities in an amount to be determined at trial, but not less than $8.1 million, plus prejudgment statutory interest.

151.    As a consequence of the foregoing, Brodie is entitled to trebled damages and to reimbursement of his costs and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF
### (Fraud in the *Factum* against Rower and the Foundation)

152.    Brodie repeats and realleges paragraphs 1 through 126 above as if fully set forth herein.

153.    Rower and the Foundation caused the December 2019 Report to include deliberately false statements of material fact concerning the Mobile's condition.

154.    The Foundation's July 10, 2024 letter to Brodie also includes deliberately false statements of material fact concerning the Mobile's condition.

155.    By the terms of the Examination Agreement that state it "does not in any way create a contract between the Foundation and [the work's] Owner, for the purpose of authentication or other related matters," the Foundation's statements concerning the Mobile were not in performance of any contractual duty.

156.    Rower and the Foundation additionally had a duty to speak with care about the Mobile given their relationship with Brodie, and given the role they had constructed for themselves as the true and authoritative judge of Calder works, and their information advantage relative to Brodie such that, in morals and good conscience, Brodie had the right to rely upon Rower and the Foundation to speak truthfully.

157.    Brodie was deceived by Rower and the Foundation into justifiably believing that they would provide a learned and honest evaluation of the Mobile, when, in fact, Rower and the Foundation were only trying to constrain Brodie to enlist their review so that they could disparage the Mobile upon fabricated grounds.

158.    Rower and the Foundation breached their duty to Brodie by engineering the December 2019 Report and causing it to express fabricated facts about the Mobile's condition.

159.    Rower and the Foundation similarly breached their duty to Brodie through their rescission of the Mobile's A-number on July 10, 2024 upon their fabrications concerning the Mobile's condition.

160.    Rower and the Foundation acted with an intent to deceive Brodie.

161.    But for Rower's and the Foundation's fraud, Brodie would have been able to sell the Mobile.

162.    Rower's and the Foundation's fraud has proximately caused harm to Brodie in an amount to be determined at trial, but at least $8.1 million, plus prejudgment statutory interest.

163.    Due to the wanton, willful and immoral nature of Rower's and the Foundation's misconduct, Brodie is entitled to punitive damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Gross Negligence Against Rower and the Foundation)

164.    Brodie repeats and realleges paragraphs 1 through 126 above as if fully set forth herein.

165.    By the terms of the Examination Agreement that state it "does not in any way create a contract between the Foundation and [the work's] Owner, for the purpose of authentication or other related matters," the Foundation's statements concerning the Mobile were not in performance of any contractual duty.

166.    Rower and the Foundation additionally had a duty to speak with care about the Mobile given their relationship with Brodie, and given the role they had constructed for themselves as the true and authoritative judge of Calder works, and their information advantage relative to Brodie such that, in morals and good conscience, Brodie had the right to rely upon Rower and the Foundation to speak truthfully.

167.    Rower and the Foundation breached their duty to Brodie by rescinding the Mobile's A-number on July 10, 2024 on wholly unfounded and fabricated grounds.

168.    Rower's and the Foundation's rescission of the Mobile's A-number evinced a reckless disregard for the rights of Brodie and smacks of intentional wrongdoing.

169.    Rower's and the Foundation's conduct proximately caused harm to Brodie in an amount to be determined at trial, but at least $8.1 million, plus prejudgment statutory interest.

170.    Due to the wanton, willful and immoral nature of Rower's and the Foundation's misconduct, Brodie is entitled to punitive damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
### (Product Disparagement Against Rower and the Foundation)

171.    Brodie repeats and realleges paragraphs 1 through 126 above as if fully set forth herein.

172.    Rower's and the Foundation's rescission of the Mobile's A-number in July 2024 on maliciously false grounds disparaged the Mobile and reflected negatively on its quality, condition and value.

173.    Rower's and the Foundation's rescission of the Mobile's A-number constitutes a willfully false statement that lacks any objective support.

174.    Rower's and the Foundation's rescission of the Mobile's A-number was motivated solely by malice and an intention of depriving Brodie of the ability to sell the Mobile in competition with Rower's and the Foundation's interests.

175.    Upon information and belief, Rower and the Foundation have published their disparaging rescission of the Mobile's A-number to third persons.

176.    Rower's and the Foundation's disparagement of the Mobile has caused special damages to Brodie in that Brodie has lost the opportunity to sell the Mobile.

177.    Brodie has been damaged in an amount to be determined at trial, but at least $8.1 million, plus prejudgment statutory interest.

178.    Due to the wanton, willful and immoral nature of Rower's and the Foundation's misconduct, Brodie is entitled to punitive damages in an amount to be determined at trial.

WHEREFORE, Plaintiff Richard Brodie respectfully prays for judgment as follows:

i.    on his First Claim for Relief, damages in an amount to be determined at trial but at least $8.1 million, trebled, plus prejudgment statutory interest, plus reimbursement of Brodies' costs and reasonable attorneys' fees;

ii.    on his Second Claim for Relief, damages in an amount to be determined at trial but at least $8.1 million, plus prejudgment statutory interest, plus punitive damages in an amount to be determined at trial;

iii.    on his Third Claim for Relief, damages in an amount to be determined at trial but at least $8.1 million, plus prejudgment statutory interest, plus punitive damages in an amount to be determined at trial;

      iv.      on his Fourth Claim for Relief, damages in an amount to be determined at trial but at least $8.1 million, plus prejudgment statutory interest, plus punitive damages in an amount to be determined at trial; and

      v.      such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issue so triable.

Dated: New York, New York
      January 6, 2025            PRYOR CASHMAN LLP

By: _____
      William L. Charron
      wcharron@pryorcashman.com
      James A. Janowitz
      jjanowitz@pryorcashman.com
      Jessica Rosen
      jrosen@pryorcashman.com

      7 Times Square
      New York, New York  10036
      (212) 421-4100

      *Attorneys for Plaintiff Richard Brodie*